**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY and Allstate Insurance Company, Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

Nos. 85 C 7080, 85 C 7081.

United States District Court, N.D. Illinois, E.D.

Nov. 18, 1987.

As Supplemented Nov. 19, 1987.

Roger W. Barrett, Franklin P. Auwarter, Daniel M. Harris, Thomas P. Healy, Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

Thomas W. Conklin, Howard L. Lieber, Conklin & Adler, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Harbor Insurance Company ("Harbor")[1] has sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank")[2] and a host of other defendants, seeking to avoid liability under the directors' and officers' ("D & O") liability policy (the "Policy") Harbor had issued to CIC.[3] Harbor, the primary D & O carrier, has now parted company with excess carriers Allstate and National Union: It has (1) retained separate counsel, (2) tendered a separate proposed Amended Complaint (the "Amended Complaint") and then (3) settled with the insureds under its 1982–83 policy year coverage[4] by tendering the $15 million policy limit less advances Harbor had previously made on a conditional basis.[5]

Continental has now moved to strike Amended Complaint Count XV, initially under Fed.R.Civ.P. ("Rule") 12(f) and then alternatively under Rule 12(b)(6). For the reasons stated in this memorandum opinion and order, Continental's motion is denied—but only in technical and not substantive terms.

---

1. As the dual case caption reflects, excess insurers Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") have also brought suit against the defendants here (originally the same law firm represented all three insurers in the two actions). Though this opinion deals only with one of the plaintiffs in 85 C 7081 and not at all with 85 C 7080, for purposes of continuity and clarity the caption follows the same practice as all prior opinions by listing both actions (see n. 3).

2. CIC and Bank are collectively called "Continental."

3. Because this Court has typically begun all its opinions in these cases with much the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's twenty-eighth written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court. For the same ease in reference, earlier opinions will also be cited by number.

4. Harbor's Policy afforded coverage for claims made against Continental's directors and officers during the three-year period from August 8, 1981 through the same date in 1984. This opinion will speak in terms of the respective policy years (for example, the "1982–83 policy year" is the period from August 8, 1982 through the same date in 1983).

5. Though the parties informed this Court of that settlement some months ago, so that the last several opinions have been based on that premise, more recent advice from the litigants is that the settlement documentation has not yet been completed. This opinion will, however, continue to assume the settlement is in place.

*Facts* [6]

Several provisions of Policy Section A are primarily relevant to the current inquiry, though others will be referred to in the course of this opinion. Under the Insuring Clause (Policy ¶ 1 [7]) Harbor agrees to: [8]

> PAY ON BEHALF OF THE INSURED LOSS (AS HEREINAFTER DEFINED) ARISING FROM ANY CLAIM OR CLAIMS MADE DURING THE POLICY PERIOD AGAINST EACH AND EVERY ... DIRECTOR OR OFFICER OF THE INSURED....

All the other principally relevant provisions are found in Policy ¶ 5 ("Limits and Retention"):

> (A) THE COMPANY SHALL BE LIABLE TO PAY 95% OF LOSS EXCESS OF THE AMOUNT STATED IN (C) BELOW UP TO THE AMOUNTS HEREAFTER STATED, IT BEING WARRANTED THAT THE REMAINING 5% OF EACH AND EVERY LOSS SHALL BE CARRIED BY THE INSURED AT ITS OWN RISK AND UNINSURED.
>
> (B) SUBJECT TO THE FOREGOING, THE LIABILITY OF THE COMPANY FOR ANY CLAIM OR CLAIMS AND/OR COSTS, CHARGES AND EXPENSES SHALL BE $15,000,000. WHICH, REGARDLESS OF THE TIME OF PAYMENT BY THE COMPANY, SHALL BE THE MAXIMUM LIABILITY OF THE COMPANY IN (I) EACH POLICY YEAR DURING THE POLICY PERIOD OR (II) IN THE LAST POLICY YEAR IN WHICH COVERAGE IS PROVIDED HEREUNDER PLUS THE PERIOD OF 12 MONTHS SET OUT IN CLAUSE 8(A) IF THE RIGHTS UNDER SUCH CLAUSE ARE EXERCISED.
>
> (C) THIS POLICY IS ONLY TO PAY THE EXCESS OF $75,000. IN THE AGGREGATE IN RESPECT OF EACH AND EVERY LOSS HEREUNDER, INCLUDING COSTS, CHARGES AND EXPENSES AS DESCRIBED IN CLAUSE 6 AND SUCH $75,000. IS TO BE BORNE BY THE INSURED AS A RETENTION AND IS NOT TO BE INSURED. LOSSES ARISING OUT OF THE SAME ACT OR INTERRELATED ACTS OF ONE OR MORE OF THE DIRECTORS OR OFFICERS SHALL BE CONSIDERED A SINGLE LOSS AND ONLY ONE RETENTION OF $75,000. IN THE AGGREGATE SHALL BE APPLIED TO EACH LOSS.
>
> (D) THE FOREGOING PROVISIONS SHALL APPLY TO THIS POLICY AND POLICY NO. H1 152086 B AS THOUGH THEY CONSTITUTE A SINGLE POLICY AND THE MAXIMUM LIABILITY OF THE COMPANY UNDER BOTH POLICIES TOGETHER SHALL NOT EXCEED THE LIMITS SET OUT IN PARAGRAPHS 5(A) and 5(B) ABOVE.

It is undisputed that covered claims were made against Continental's directors and officers and brought to Harbor's attention during each of two policy years. One group of lawsuits, filed during the 1982–83 policy year shortly after the collapse of the Penn Square Bank in July 1982, was consolidated as *In re Continental Illinois Securities Litigation,* 82 C 4712 (N.D.Ill.) (*"Consolidated Action"*). Later lawsuits, filed during the 1983–84 policy year, comprise *Spring v. Continental Illinois Corp.,* 84 C 4680 (N.D.Ill.), *DiLeo v. Baumhart, et al.,* 84 C 7305 (N.D.Ill.) and *Rothschild v. Continental Illinois Corp.,* 84 C 8596 (N.D.Ill.).

*Consolidated Action* Complaint ¶ 17 identifies its plaintiff class as all persons "who purchased shares of Continental Illinois common stock during the period from September 1, 1981 through July 29, 1982

---

6. These facts are drawn from Harbor's Policy and from the complaints in the underlying litigation comprising the claims triggering coverage under the Policy.

7. As the quoted Policy provisions reflect, the document is not internally consistent in cross-referencing its provisions (sometimes it uses "Clause," sometimes "Paragraph"). For conve-nience this opinion will consistently use the "¶" sign.

8. This and the following verbatim extended quotations follow the all-capitals style of the Policy. However, the rest of this opinion will use the upper and lower case style to which the eye is more accustomed.

inclusive...." Still other counts in the *Consolidated Action* Complaint were asserted as shareholder derivative claims under Rule 23.1. In each instance, of course, the claims were necessarily based on conduct that antedated the lawsuit.

Each of the three actions brought during the 1983–84 policy year necessarily had to state causes of action not encompassed within the *Consolidated Action* in order to survive as a separately viable lawsuit. Accordingly the three sets of plaintiffs' lawyers were careful to stake out a different claim from that occupied by the first settler:

1. *Spring* Complaint ¶ 2 defined the plaintiff class as those "who purchased Continental shares on or about and between November 15, 1982 and July 11, 1984...." It asserted there had been misleading reports by Continental beginning November 15, 1982 (well after the *Consolidated Action's* marked-out time period).

2. *Rothschild* Complaint ¶ 11 defined the plaintiff class as all persons "who purchased shares of Continental Illinois common stock during the period from July 30, 1982 through May 14, 1984 inclusive...." Thus it picked up immediately after the end of the class period specified in the *Consolidated Action*. It charged Continental had misled the public after the *Consolidated Action* class period, so that the new investors in Continental stock during the ensuing period had been victimized.

3. *DiLeo*, like *Rothschild*, sought to follow directly on the heels of the *Consolidated Action*. Indeed *DiLeo* Complaint ¶ 5 specifically said its plaintiff class was all persons "who purchased common stock of the Continental Illinois Corporation from July 6, 1982 (the ending date of a class certified in other proceedings relating to securities of the Corporation) through July 26, 1984...." It too advanced claims like those in *Rothschild*.

### Harbor's Contentions

Harbor's current counsel, like their predecessors in representing both Harbor and excess insurers Allstate and National Union, are forced to contend with client-devised policy language that on its face generates more liability than the client would like to recognize. Somehow counsel must get around the indisputable fact that Policy-covered claims were made in *two* policy years, thus creating the prospect of $30 million rather than $15 million in coverage under Policy ¶ 5(B).

As Harbor would have it, the concept of "loss" found elsewhere in the Policy is somehow imported into Policy ¶ 5(B) (even though the word "loss" is nowhere to be found in that provision), so that claims admittedly made in a later policy period are to be treated by a Policy-created fiction as though they had been made in an earlier period. On its face that notion calls for considerable bending—if not outright breaking—of the Policy language, and analysis confirms that such rewriting of the Policy is simply not sustainable.

### Coverage Under Harbor's Policy

D & O policies, like other insurance policies indemnifying against an insured's liability for his, her or its conduct (familiar examples are professional liability policies —for lawyers, accountants, doctors, architects and so on), are basically classifiable into two categories: occurrence coverage and claims-made coverage. In the former situation, the insurer protects against claims (whenever made) arising out of the insured's conduct during the policy period. In the latter, the insurer protects against claims asserted against the insured during the policy period, even though arising out of conduct that may have antedated the policy period.

Each class of policies poses obvious risks to an insurer. Though the risks are different, they share at least one thing: the need for the insurer to minimize those risks by careful draftsmanship.

Occurrence policies create the potential of a ticking time bomb. Subject only to statute of limitations problems, the insurer can be confronted with an unpleasant surprise—an unexpected claim—many years

after the premium has been collected and the policy year has ended. And these days, with no shortage of imaginative grounds for the tolling of limitations, the insurer cannot take full comfort even when the normal limitations period has expired.

Claims-made policies do not present the same hazard of an indefinite future: Once the policy period has expired, the book can be closed on everything except then-pending claims. But there is a risk at the front end—the insurer can walk unwittingly into a claim that has been brewing and was ripe to erupt before the policy period, but is asserted only after the policy period begins. Indeed, absent protective language in the policy application, the insurer can be the victim of what the insurance trade calls "adverse selection": the phenomenon that people who already know they have the greatest risks are more likely to seek insurance coverage.

For understandable reasons, the trend of more recently issued policies in the D & O and professional liability fields has been away from the occurrence type toward the claims-made type. After all, by framing the policies properly the insurer can eliminate the risk of hidden problems *known* to the insured,[9] thus leaving a policy of the type insurers always prefer: one reasonably predictable in actuarial or underwriting terms, so that a premium can be set to combine expected risk and desired profit.

It is therefore obvious that all aspects of policy coverage are within the insurer's control as a matter of careful drafting of the policy's terms. It is up to the insurer to define the scope of coverage, the amount of coverage, the amount of retention (the "deductible" amount) and all other components that make up the insurance package. Because all these factors represent known matters requiring decision, and because those decisions are made by the insurer in terms of framing the policy to be presented to the applicant for insurance, the legitimate approach taken by the law is to place the risks of non-definition or poorly-conceived definitions on the insurer.[10]

All this of course is only a background for decision. It would have been possible and perfectly appropriate for this opinion to turn to Harbor's Policy first, but because Harbor is unquestionably trying to make its own language do a job for which it is ill-suited, there was good reason to place the question in context. Now this opinion returns to the point of beginning: the Policy itself.

Harbor's contention is essentially one of editing its own language to merge the concepts of "claim" and "loss." It is, after all, the term "loss" that is limited by Policy ¶ 5(C), and the term "loss" does not even appear anywhere in the crucial provision—Policy ¶ 5(B).

Indeed the situation is just the opposite from that claimed by Harbor. "Claim" (the operative term in Policy ¶ 5(B)) is not defined anywhere in the Policy, while "loss" is (Policy ¶ 2(C)). Harbor specifically chose to give the terms "claim" and "loss" a *different* rather than an *identical* content. In defining the latter term, Policy ¶ 2(C) specifically tells us the terms are different concepts, though related in the proximate-cause sense: "Claims" give rise to "losses." That carries forward the identical principle expressed in the Insuring Clause itself, Policy ¶ 1.[11]

> Insurance companies, members of a service industry, must recognize that they, like their insureds, have corresponding duties and obligations under the policy and must conduct themselves accordingly instead of attempting to rely on the courts to correct their own deficiencies in underwriting and/or careless policy drafting.

---

9. That can be done by requiring, as part of the policy application, broad representations by the insured as to every known potential claim. If those representations prove false, the insurer can avoid liability on any undisclosed claim—or if the omission was material to the risk, may be able to rescind the policy altogether.

10. Immediately after this opinion was issued this Court received the slip opinion in *Heller v. Equitable Life Assurance Society of the United States*, 833 F.2d 1253, 1260 (7th Cir.1987), which makes the identical point:

11. It is scarcely necessary to multiply examples, but the Policy usage is consistent throughout. Policy ¶ 3 reflects a parallel proximate-cause treatment of the two terms; "claim" is also given the identical usage in Policy ¶ 4's exclu-

It thus requires nothing more than a plain reading of the Policy to understand that the terms "loss" and "claim" are not synonymous, as Harbor would now have it. If Harbor had wished to accomplish the result for which it now contends, it would have been the simplest thing in the world for it to draft each subparagraph of Policy ¶ 5 in symmetrical terms:

1. Policy ¶ 5(A) could have been written, as it was, to specify what percentage of each "loss" Harbor would pay.

2. Policy ¶ 5(B) could have been written, as it was *not*, to specify the maximum total "loss" (and not the total amount of "any claim or claims") payable in any policy year.

3. Policy ¶ 5(C) could have been written to specify the amount of the retention *and* to say that more than one "loss" will be viewed as a single loss not only (a) for retention purposes (as the Policy *was* written) but also (b) for purposes of applying Policy ¶ 5(B) (as it was *not*).[12]

If Harbor had in fact chosen to draft the Policy that way, a "loss" sustained in one year could have been attributable to another year in defining Harbor's maximum exposure under Policy ¶ 5(B), and this Court would then have been called upon to decide whether the four lawsuits at issue here present "losses arising out of the same act or interrelated acts of one or more of the directors or officers" (Harbor's relied-on language from Policy ¶ 5(C)). But Harbor did not do that, and the necessary result is that it must live with the consequences.

Before this opinion turns to those consequences, one point in the preceding analysis, already suggested by the third numbered paragraph above discussing what Harbor should have done in drafting Policy ¶ 5(C), bears further emphasis. To win the current motion, it simply would not be enough for Harbor to prevail on the idea that the four lawsuits—the several claims against Continental's directors and officers —represent "losses arising out of the same act or interrelated acts." As Policy ¶ 5(C) reads, that concept has significance *only* for establishing a single $75,000 retention despite multiple losses. Nothing in either Policy ¶ 5(C) *or* Policy ¶ 5(B) suggests that the same concept carries over into the latter provision—and that would be so even if the latter provision had spoken in terms of "loss" rather than "claim." That kind of draftsmanship carries with it a negative rather than a positive inference: Harbor's inclusion of "loss"-defining language in a single contractual provision, rather than by way of an overall definition of the term, strongly implies that the same definition does *not* apply elsewhere.[13] Hence even were Harbor able to weather the adverse consequences of its first drafting choice, it would still lose as a result of its second choice (its failure to have drafted Policy ¶ 5(C) in the manner suggested earlier).

But to return to that first drafting choice —the Policy's careful and consistent separation of "claim" and "loss" as different rather than identical terms—what are the consequences for Harbor? Each different "claim" must be placed within the time frame—the policy year—when it was asserted, in order to determine the amount of

---

sion provisions; and similarly careful usage of "loss" and "claim" as separate and distinct terms is reflected in Policy ¶¶ 7(A), 7(B) and 7(C).

**12.** Of course a policy written that way would have given Continental less than three years' full coverage in exchange for the payment of three years' full premiums. But if the contingencies of interrelated losses had arisen, Continental could not more have then complained about the bargain it had struck than Harbor can now complain of the bargain it fashioned for itself. In fact Harbor has less cause to complain, because it *chose* how the bargain was to be framed.

**13.** Compare, in a different context that this Court is now dealing with in another case, Congress' adoption of a sweeping definition of "employer" in ERISA subchapter I (which deals with liability for delinquent contributions) but not in subchapter III (which deals with withdrawal liability under ERISA). Courts of Appeals called upon to construe employer liability for withdrawal liability purposes have consistently drawn the negative inference that the word "employer" does not have the same broad meaning in the two contexts (*DeBreceni v. Graf Brothers Leasing, Inc.*, 828 F.2d 877 (1st Cir. 1987); *Connors v. P & M Coal Co.*, 801 F.2d 1373 (D.C.Cir.1986)).

Harbor's potential liability under Policy ¶ 5(B). Though the Policy does not define "claim" as such, that concept offers no mystery here.[14] Even Harbor does not assert that the *Consolidated Action* presented the *same* claim as *Spring, Rothschild* and *DiLeo.* After all, the plaintiffs in each of the last three lawsuits were careful (as they had to be to avoid being swallowed up by the first one) to represent a totally different plaintiff class, with no overlap whatever, from the plaintiff class in the *Consolidated Action.* And the last three complaints make plain that they focus on Continental's conduct in the later class periods as the predicate for their claims.

In light of that total separation in the identity of the claimants and in the time frames covered by the different lawsuits, it is therefore of no significance to consider whether Continental's course of conduct complained of in the last three lawsuits was or was not an outgrowth of the course of conduct that triggered the first one (a matter on which the litigants spend much of their effort on the current motion). Without question the *Spring, Rothschild* and *DiLeo* lawsuits are different claims that must be allocated to the policy year when they were asserted: the 1983–84 policy year.[15]

### Relevant Authorities

To this point the analysis has been made—and the ultimate conclusion has really been reached—without a single case citation, other than those parenthetically implicated in nn. 10 and 13. There is nothing remarkable about that, because after all we are dealing with the reading of a document written in the English language.

What other courts may or may not have said about the meaning of like terms undefined in the document itself may perhaps be of marginal help, in much the same way that a dictionary may provide common usage as a clue to the particular usage in a document. But here the only undefined term in controlling Policy 5(B) is "claim," and as already said the parties really do not quarrel about the fact that different "claims" were made in the 1983–84 policy year from the *Consolidated Action* claim in the preceding policy year.

Nevertheless a brief look may be taken at the case law invoked by the parties, if only to demonstrate that the cases afford no particular added help to the simple task of reading the unambiguous Policy. Before that is done, of course, it bears repeating that if the document *were* viewed as ambiguous, its reading would go against Harbor anyway (see this Court's discussion of the contra proferentem doctrine principle earlier in this action in the Ninth Opinion, 643 F.Supp. 1434, 1439 (N.D.Ill.1986) and cases cited, and see also *Goldblatt Bros., Inc. v. Home Indemnity Co.,* 773 F.2d 121, 125 (7th Cir.1985) and cases cited).[16]

Harbor Mem. 10 calls on three cases (*Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56 (3d Cir.1982), *Business Interiors, Inc. v. Aetna Casualty and Surety Co.,* 751 F.2d 361 (10th Cir.1984) and *Aetna Casualty & Surety Co. of Illinois v. Medical Protective Co. of Ft. Wayne, Indiana,* 575 F.Supp. 901 (N.D.Ill.1983)) as standing for an undeniable proposition:

---

**14.** More on this subject later, however.

**15.** In fact Harbor's own argument is that the last three lawsuits were "claims" for concededly different "losses" than the claim asserted in *Consolidated Action,* but that those later losses arose "out of the same act or interrelated acts of one or more of the directors or officers." Even though it is unwilling to accept the logical consequences, Harbor Surreply Mem. 6 "does not contest the fact that a claim is a right asserted by a third party"—a concession that different claims are at issue in the last three lawsuits (and that different losses would be as well, were

it not for the "interrelated" limitation specified in the Policy).

**16.** *Heller,* at 1257 reiterates both that principle and the policy reason supporting it:

> The insurance industry by its very nature offers insurance coverage on a non-negotiable basis, and consumers are unable to participate in the drafting of the language or the terms of the policy. Case law and fairness require that ambiguities in insurance policies be construed against the drafter of the policy, the insurance company.

It is well settled that in order to determine whether a single or multiple occurrences have taken place, for purposes of policy coverage, the cause or causes of injury must be examined.

But the short answer is that each of those cases was required to occupy itself in the inquiry as to the number of "occurrences" only because each court was dealing with an occurrence-type policy. In each instance the question was whether the insurer had to bear the risk because the "occurrence" that caused the loss sued upon had taken place within the insurer's policy term, or whether the insurer had no liability because the "occurrence" had arisen at another time. It was precisely to avoid such arcane inquiries that Harbor elected to write *its* policy coverage in objectively ascertainable terms: when a *claim* was made, not when the occurrence that triggered the claim first arose. Having made that very different choice, Harbor can draw no comfort from cases that answer a totally different question from the one posed here. ·

Continental fares better in its resort to precedent, if only because its task is not, like Harbor's, one of changing the Policy language to say something different from its plain meaning. Continental Motion To Strike 7 correctly calls on *Appalachian*, 676 F.2d at 59 for the unquestionable proposition already stated in this opinion:

> Under an "occurrence" policy the insured is indemnified for acts or occurrences which take place within the policy period while under a "claims made" policy the insured is indemnified for claims made during the policy period regardless of when the acts giving rise to those claims occurred.

And Continental R.Mem. 11–13 cites three cases (*National State Bank, Elizabeth, N.J. v. American Home Assurance Co.*, 492 F.Supp. 393, 397 (S.D.N.Y.1980), *Com-*

*bined Communications Corp. v. Seaboard Surety Co.*, 641 F.2d 743, 745 (9th Cir.1981) and *Colbert County Hospital Board v. Bellefonte Insurance Co.*, 725 F.2d 651, 653–54 (11th Cir.1984),[17] as well as *Black's Law Dictionary* (5th ed. 1979)) for the universal understanding of "claim" as meaning a "cause of action" (*Black's*). On that score, as already stated, Harbor has really acknowledged that concept of claim (Harbor Surreply Mem. 6 says "HARBOR does not contest the fact that a claim is a right asserted by a third party"), and there really cannot be a quarrel with the characterization of the last three underlying lawsuits here (*Spring, Rothschild* and *DiLeo*) as presenting different "claims" from the *Consolidated Action.*

In sum, whatever limited judicial precedent has any relevance here confirms the conclusion compelled by a straightforward reading of the Policy. Harbor has liability exposure for $30 million—$15 million for the *Consolidated Action* claim made against Continental during the 1982–83 policy year, and $15 million for the claims made against Continental by the *Spring, Rothschild* and *DiLeo* actions during the 1983–84 policy year.[18]

### Continental's Relief

Continental has not adequately addressed (or perhaps has not adequately conceived) the procedural aspects of its current motion. By its terms, Rule 12(f) is designed to get rid of insufficient defenses, not complaints (see the Notes of Advisory Committee on Rules to the 1946 amendment to Rule 12(f)), or to cause "any redundant, immaterial, impertinent, or scandalous matter to be stricken." And Rule 12(b)(6) deals with pleadings that are legally insufficient because they fail to state a claim upon which relief can be granted.

In this case, Harbor's Amended Complaint Count XV seeks a declaration that its

---

**17.** All those cases read "claim" in its common (and commonsense) usage: an effort by a third party to recover money from the insured.

**18.** This opinion does not deal with the question whether the losses represented by the four lawsuits do or do not give rise to a single $75,000

retention under the "interrelated acts" provision of Policy ¶ 5(C). Even though $75,000 is nothing to sneeze at, in the context of the multimillion dollar coverage under the Policy that issue can presumably await the need for fine tuning later in the litigation.

liability "is limited to $15,000,000 less the self insured retention" (Count XV ¶ 73). Unlike some of the situations that this Court has been called upon to deal with in earlier opinions in these actions, the amount of Harbor's potential liability certainly poses a live Article III "case" or "controversy," thus enabling this Court to take jurisdiction to declare the parties' rights (see the seminal decision in *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). What that means is that Harbor *has* stated a cause of action for declaratory relief and that its Count XV does not merit any of the pejorative characterizations in Rule 12(f)—Harbor simply gets a very different declaration from the one it had hoped for.

### Conclusion

Continental's motion must be denied in its entirety in the form presented to this Court. Harbor is entitled to have brought its proposed Count XV for declaratory relief, but the result of its having done so is that its potential liability under the Policy is declared to aggregate $30 million rather than $15 million (in each instance less the applicable retention provision).