Walter GILLIAM, Plaintiff,

v.

AMERICAN CASUALTY CO., OF READING, PENNSYLVANIA, Defendant.

FEDERAL DEPOSIT INSURANCE CORPORATION, a federal agency, and Allan R. Jamieson, Intervenors–Plaintiffs,

v.

AMERICAN CASUALTY CO., OF READING, PENNSYLVANIA, Defendant.

And Related Cases.

Nos. C–89–3813 WHO, C–86–1245 WHO and C–89–3167 WHO.

United States District Court, N.D. California.

March 26, 1990.

As Amended April 17, 1990.

Geoffrey Becker, Becker & Becker, South San Francisco, Cal., for plaintiff.

John S. Siamas, Kenneth Philpot, John C. Dwyer, Jackson, Tufts, Cole & Black, San Francisco, Cal., Markl Gabrellian, Federal Home Loan Bank Bd., Washington, D.C., for intervenors-plaintiffs.

Theodore Boundas, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiff, Walter Gilliam, is a beneficiary under a Directors' and Officers' Liability Insurance Policy ("D & O policy") issued by defendant, American Casualty Company of Reading, Pennsylvania, also known as CNA Insurance Company (jointly "American"). In this declaratory relief action, the parties filed cross-motions for summary judgment to determine whether the maximum coverage of the policy is $100 million as claimed by American or $200 million as claimed by Gilliam. The specific legal issue to be decided is whether the annual limits of liability apply to the policy years in which wrongful acts allegedly occurred or the policy year in which notice of a claim was made. For the reasons following, the Court finds that the maximum coverage under the policy in question is $100 million, and the annual limits of liability apply to the policy year in which notice of a claim was made.

I.

In 1982, Eureka Federal Savings & Loan Association ("Eureka") purchased a D & O policy from MGIC Indemnity Corporation ("MGIC"). Gilliam was an officer of Eureka. On November 1, 1983, American as-

sumed the liability of MGIC, including the policy it issued in this case.[1]

The policy covered a three-year period, from October 26, 1982, through October 26, 1985, and provided three separate annual limits of liability. Item 3 of the policy declarations set forth the limits of liability as being "$20,000,000 each Loss"; "$20,000,000 Aggregate Limit of Liability each policy year for each Director and Officer." The three-year premium was prepaid.

In 1983, Eureka implemented an aggressive lending strategy to reverse chronic operating losses. Between early 1983 and September 1984, five of Eureka's directors made over two hundred loan transactions that resulted in significant losses to the association. The loan transactions made during this period are the subject of a related lawsuit, *Federal Savings & Loan Insurance Corp. v. Kidwell*, 716 F.Supp. 1315 (N.D.Cal.1989), now pending before this Court that alleges breach of fiduciary duty, negligence, mismanagement, and waste against the individual Eureka directors.

On June 20, 1985, during the third year of the policy period, Eureka wrote a five-page letter to American providing detailed notice of various potential claims that might arise from several loans that had been funded by Eureka during the first two years of the policy period. American concluded that this letter constituted adequate notification of all claims asserted against the former officers of Eureka in the *Kidwell* case, and deemed those claims to have been made on June 24, 1985 (the date of notice).

In the *Kidwell* case, the challenged loans occurred during policy years one and two, while notice was given in policy year three. Gilliam seeks a declaration that American is liable for two full years of insurance coverage. He contends that, because the challenged loans were made in years one

and two of the policy period, two separate yearly limitations apply to the *Kidwell* action. The Federal Deposit Insurance Corporation ("FDIC") intervened in this declaratory judgment suit, and has joined in Gilliam's motion.[2]

American opposes Gilliam's motion, and seeks a declaration that it is liable for only one year of insurance coverage under the policy. It argues that only the limitation for policy year three is applicable to the *Kidwell* claims because this was the year in which notice was given and when all claims were later deemed to have been made.

## II.

American contends that the issue of the scope of coverage under the policy has already been litigated in a prior proceeding in the related *Kidwell* case. It refers to this prior action, *Eureka Federal Savings & Loan Ass'n v. American Casualty Co. of Reading, Pennsylvania*, 873 F.2d 229 (9th Cir.1989), as the "multiple loss" case. American claims that, as a result of the holding in the multiple loss case, Gilliam and the FDIC are barred by principles of claim preclusion from raising the scope of coverage issue again in this case. American is incorrect.

The issue litigated in the multiple loss action was whether or not the loan transactions at issue in the *Kidwell* case constituted multiple losses or a single loss within the meaning of Section 4(D) of the policy. American contends that, because the issue of yearly liability limits raised here arises from "the same transactional nucleus of facts" as the issue of multiple losses that was previously litigated, it is now barred from this Court's consideration because Gilliam did not raise the issue of the yearly limits of liability in the first suit.

---

**1.** MGIC subsequently changed its name to WMBIC Indemnity Corporation, and then underwent liquidation.

**2.** Allan R. Jamieson, a co-defendant in the *Kidwell* case, intervened in a separate declaratory relief action that is related to this case. His

complaint in intervention, filed February 22, 1990, sought declaratory relief regarding the limits of liability under the policy that is the subject of this action. On March 2, 1990, Jamieson filed a certificate with the Court in which he agreed to be bound by the Court's decision here.

■ American overlooks the fact that the multiple loss action was a declaratory relief action. Two federal circuits have held that, in actions for declaratory relief, the "merger" aspect of *res judicata* is not applicable, and the appropriate principles are those of issue preclusion, not claim preclusion. *See Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530 (5th Cir.1978); *Empire Fire & Marine Insurance Co. v. J. Transport, Inc.*, 880 F.2d 1291 (11th Cir.1989).

Because a plaintiff who prevails in a declaratory relief action may file subsequent suits seeking damages or other relief, the *Kaspar* and *Empire* Courts held that *res judicata* principles cannot be mechanically applied in these suits. Rather, the correct analysis to be applied is that of issue preclusion, which only bars subsequent relitigation of issues actually litigated in the prior suit that were necessary to that judgment. *Kaspar*, 575 F.2d at 537; *Empire*, 880 F.2d at 1295–96.

■ The parties to this declaratory relief action do not dispute that the yearly limits of liability issue was not actually litigated in the multiple loss case. In fact, American's argument rests on the claim that Gilliam should have raised, but did not raise, this issue in the previous action. Accordingly, the reasoning underlying the *Kaspar* and *Empire* decisions leads the Court to find that this action for declaratory judgment regarding the yearly limits of liability is not barred by *res judicata* principles.

■ The FDIC also seeks to take advantage of the principles of *res judicata*. It argues that, because the issue of how a "loss" is defined under the policy was actually litigated and decided in the multiple loss case, American cannot now ask the Court to apply a different definition of "loss" for purposes of this action.

The FDIC has correctly invoked the principles of issue preclusion in advancing this argument. The FDIC errs, however, when it asserts that the multiple loss case finally determined the definition of "loss" that is applicable to all subsequent actions involving this policy.

In the multiple loss case, the Ninth Circuit affirmed this Court's grant of summary judgment in favor of Eureka in the *Kidwell* case. The Ninth Circuit characterized the critical question on appeal as "whether the losses in *Kidwell* arose out of the same act (the loan policy) or are otherwise sufficiently interrelated to be considered a single loss." *Eureka*, 873 F.2d at 234. The appellate court noted that this Court had previously ruled that "the claims in *Kidwell* constitute more than one loss as defined in the policy and that each loan transaction in *Kidwell* is a separate loss. . . ." *Id.* at 231. In affirming this Court's grant of summary judgment, the Ninth Circuit held that "the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions made by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss." *Id.* at 235. The issue in the multiple loss case, then, was the definition of loss in the limited context of Section 4(D) of the policy. Section 4(D) states that claims based on or arising out of the same act or interrelated acts may be aggregated into a single "loss" for purposes of determining the applicable limit of liability.

In the present declaratory judgment suit, however, this Court must construe the term "loss" as it is used in Sections 4(A) and 4(B) of the policy. These sections have nothing to do with the related nature of individual wrongful acts. Instead, these provisions outline how the yearly limits of liability are to be applied to "losses" and "claims." It is the complex relationship between losses and claims that the Court must determine in order to rule on these summary judgment motions. That issue has not been previously litigated before this Court.

The term "loss" is a defined term under the policy, and this term is used in Section 4(D) as well as in Sections 4(A) and (B). It may not be immediately apparent, therefore, why a holding as to the definition of "loss" is not dispositive of all subsequent litigation involving this term. However, in the previous action, as in this case, the

Court has been asked to apply the policy definition of "loss" to a specific situation. In the multiple loss case, the Court was required to determine whether liability for certain wrongful acts could be aggregated in applying the policy's liability limits. In this action, the Court must decide whether "losses" and "claims" are synonymous for purposes of triggering specific limits of liability. In each case, the definition of "loss" itself is not the issue, but rather the relationship between "losses" and other occurrences. While the Court must construe the term "loss" in both cases, each decision requires the Court to consider that term in a particular context.

The FDIC has latched onto the Court's prior statement in the multiple loss case that "each loan transaction in *Kidwell* is a separate loss". The FDIC hopes to borrow this statement and apply it to the case at bar in order to obtain a ruling that it is the *occurrence of "losses" rather than "claims"* that triggers coverage under the policy. The fact that each loan is a separate loss says nothing about whether coverage under the policy is triggered at the time a wrongful act occurs, or at the time notice of a claim is given. It is the latter issue that is now before the Court. Because this issue was not actually litigated in the multiple loss case, it is not precluded from consideration here.

### III.

Because this suit is not barred by *res judicata* principles, the Court must go on to construe the language of the MGIC insurance policy. The Court's analysis must begin with the well-established proposition that, as a general rule, coverage clauses are to be broadly construed in favor of the insured, and exclusions and limitations are to be narrowly construed against the insur-

er. *Continental Casualty Co. v. City of Richmond,* 763 F.2d 1076, 1079 (9th Cir. 1985). The reasonable expectation of the consumer is a factor to be considered in this process. *Id.* California courts further require that exceptions to or limitations of coverage must "clearly and unmistakably communicate[ ] to the insured the specific circumstances under which the expected coverage will not be provided." *Reserve Insurance Co. v. Pisciotta,* 30 Cal.3d 800, 809, 180 Cal.Rptr. 628, 633, 640 P.2d 764, 769 (1982). Finally, under § 790.03 of the California Insurance Code, an insurance carrier has an obligation to articulate the precise grounds on which it intends to restrict or limit coverage.

American contends that the language of the MGIC Policy is not ambiguous. It argues that the MGIC policy is a claims-made D & O policy, and that the policy language is fairly typical of that used in other claims-made insurance policies.

■ Under a claims-made policy, the carrier agrees to assume liability for *any* acts or omissions, even those made prior to the inception of the policy, as long as notice is given, or a claim is made, within the policy period.[3] W. Knepper & D. Bailey, *Liability of Corporate Officers and Directors* 691 (4th ed. 1988); Comment, *The "Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L.Rev. 925, 925–26 (1975).

In standard claims-made policies, when notice of a wrongful act that occurred prior to the policy period is given during the policy period, coverage is provided as if that act had occurred on the date when notice was given. In other words, the date of notice is deemed to be the date of loss.[4] D & O policies are frequently written on a claims-made basis. W. Knepper & D. Bailey, *supra,* at 687.[5] American contends

---

**3.** In this case, Eureka gave notice of potential claims to the insurer during the policy period, but actual claims were not filed until after the policy period. Therefore, the applicable provisions in this action are those that involve "notice" rather than "claims."

**4.** By contrast, an "occurrence" policy provides coverage for any acts or omissions that arise during the policy period, regardless of when

claims are made. Comment, *supra,* at 926. Therefore, claims-made policies theoretically provide unlimited retroactive coverage, whereas occurrence policies offer unlimited prospective coverage.

**5.** *But see National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.,* 673 F.Supp. 300, 303 (N.D.Ill.1987) ("D & O policies ... are basically classifiable into two categories:

that, because the MGIC policy is a claims-made policy, coverage under the policy can only be triggered by notice of a potential claim, or the filing of a claim itself, not by the mere occurrence of wrongful acts.

American's claim that the MGIC policy is a claims-made policy has merit. The MGIC policy contains the one element most characteristic of a claims-made policy—it provides retroactive coverage. Section 2(A) of the MGIC policy notes that the policy covers "any Wrongful Act *committed prior to the termination of this policy* arising from any claim made ... within the policy period ... [or] any claim made subsequent to the policy period as to which notice was given to the insurer within the policy period...." (Emphasis added.)

■ Nonetheless, it is not possible for American to hide behind a blanket assertion that its policy is a claims-made policy,[6] because it is the language of the MGIC policy itself that must be the starting point of any coverage analysis. This language represents the formal agreement between the parties. If the language of the MGIC policy is ambiguous, it is to be construed strictly against the insurer and in favor of coverage even if the Court determines that it is a claims-made policy.

Section 4(A) of the MGIC policy states that the insurer shall be liable to pay 100 per cent *of any loss* up to the limit of liability in subsections 4(B) and 4(C). Section 4(B) provides that the maximum liability in each policy year shall be the limit set out in the declarations ($20 million per loss with an aggregate limit of $20 million per director per policy year).

The allegedly ambiguous language arises in the second sentence of Section 4(B), which reads: *"For purposes of this Clause 4(B),* a claim shall be deemed to be made at the date notice is given ..., or at the date the claim is made ..., whichever shall occur first."* (Emphasis added.)

Gilliam argues that the second sentence of Section 4(B) is ambiguous because it fails to specify whether the yearly limits of liability are triggered by losses, claims, or wrongful acts. Gilliam correctly notes that the language of the MGIC policy never expressly states what defendant contends it means: that the date that a "loss" is deemed to have occurred is the date that notice was given to the insurer.[7]

Gilliam suggests that the insurer could easily have drafted a clear statement that the date of loss is deemed to be the date of notice, and he cites other D & O liability

occurrence coverage and claims-made coverage.").

**6.** Moreover, if the MGIC policy is, in fact, a claims-made policy, it may be in violation of a California statute that requires such policies to be clearly labeled. The rise of the claims-made policy was controversial, and many state legislatures were concerned that these policies differed dramatically from the "occurrence" provisions consumers were accustomed to in their automobile and general liability policies. *See* Comment, *supra,* at 926. In California, this controversy resulted in the enactment in 1974 of § 11580.01 of the California Insurance Code, which provides that claims-made policies issued to attorneys and health care providers "shall not be issued or delivered to any person in this state unless ... (c) [e]ach such policy ... shall contain on the face page thereof a prominent and conspicuous legend or statement substantially to the following effect: NOTICE: 'Except to such extent as may otherwise be provided herein, the coverage of this policy is limited ... to ... only those claims that are first made against the insured while the policy is in force. Please review the policy carefully and discuss the cov-

erage thereunder with your insurance agent or broker.' "

Despite the fact that the statute is limited, by its terms, to attorneys and health care professionals, one federal court viewed the existence of the statute as an indication that California requires all claims-made policies to bear an explicit label. *See Mt. Hawley Insurance Co. v. Federal Savings & Loan Insurance Corp.,* 695 F.Supp 469, 481 (C.D.Cal.1987) (with respect to a directors and officers liability policy, the court noted that California "requires a claims-made policy to bear on its face a conspicuous legend...."

**7.** In response to this argument, American contends that the Northern District of Illinois decided an issue very similar to the one before the Court here: the interaction of the terms "loss" and "claim." *National Union, supra,* n. 5. However, the *National Union* case is actually of limited utility here, since the language in the policy involved in that case differed in important respects from the MGIC policy this Court must construe. American urges that the decision is "on point," but it is not.

policies as examples of how properly to draft such a provision. For example, Section 7(a) of a D & O policy issued by the National Union Fire Insurance Company states: "The time when a Loss shall be incurred for purposes of determining the [Insurer's liability for loss] ..: shall be the date on which the Company shall give written notice to the insurer as hereinafter provided." W. Knepper & D. Bailey, *supra*, at 845.[8]

The MGIC policy contains no such provision. It refers to losses, claims, and notice without ever expressly defining the relationship between these terms. Gilliam argues that the lack of such an express provision in the MGIC policy makes the policy ambiguous, because the policy does not explain whether a "loss" is deemed to have occurred when the wrongful acts took place, or when the insurer received notice of the potential claim.[9] Gilliam interprets this alleged ambiguity to mean that, with respect to wrongful acts that occurred *during* the policy period, the MGIC notice requirement exists only to preserve the general right to coverage, and that, once general coverage is preserved, the yearly liability limits should apply separately to each year in which wrongful acts occurred.[10]

American responds that the language of Section 4(B) is not ambiguous, and constitutes an "abundantly clear" statement that the date of notice or claim is deemed to be the date of loss for purposes of determining which yearly limits apply. However, while Section 4(B) does address when a claim is deemed to have been made for the purposes of applying the yearly liability limits, it does not address when a loss is deemed to have occurred for that same purpose.

While the Court, therefore, disagrees with American that Section 4(B) is "abundantly clear," it is also not convinced that the policy is ambiguous. When the policy is construed as a whole, with all of its provisions taken together, the connection between claims, losses, and wrongful acts is discernible.

As an initial matter, Gilliam has repeatedly urged the Court to find that the yearly limits of liability under the policy are triggered when "losses" occur. Gilliam uses the term "losses" to refer to the disputed loan transactions. The term "loss," however, is a term of art that is defined in the policy, and the policy definition clearly links losses with claims.

The term "loss" is defined in Section 1(D) of the policy, as *"any amount which the Directors and Officers are legally obligated to pay* or for which the Association is required to indemnify the Directors or Officers, ... *for a claim or claims made* against the Directors and Officers for

---

8. *See also* W. Knepper & D. Bailey, *supra*, at 715, quoting the following provision from a D & O policy issued by the Chubb Group: "[A]ll Loss arising out of all interrelated Wrongful Acts of any Insured Person(s) shall be deemed ... to have originated in the earliest Policy Year in which a claim is made...."

9. Gilliam contends that American subsequently amended Section 4(B) to clarify the relationship between yearly liability limits and the making of a claim. The amended version of the policy, which the parties agree is inapplicable to the present action, provides, *inter alia*, that the insurer's maximum liability is *for claims made* in each policy year. The previous version of Section 4(B) had referred to "[t]he Insurer's maximum liability in each policy year" without specific reference to "claims made."

Although the amended version of Section 4(B) does not apply to this action, Gilliam argues that the amendment of Section 4(B) demonstrates that the original MGIC policy was ambiguous.

Facts submitted in support of a summary judgment motion must be admissible evidence. F.R. Civ.P. 56(e). Under Federal Rule of Evidence 407, evidence of subsequent remedial measures is not admissible to prove culpable conduct by the party taking those measures. Accordingly, the Court may not consider American's subsequent modification of its D & O policy in deciding this summary judgment motion.

10. Applying Gilliam's policy interpretation to the facts of the *Kidwell* case would result in a finding that the American is potentially liable for $200 million in coverage. Under Gilliam's interpretation, notice of the wrongful acts that occurred during years one and two of the policy period was given during year three, thereby "preserving coverage." Once coverage was preserved, two separate $100 million yearly liability limits would apply to each of the two years in which wrongful acts occurred.

Wrongful Acts...." [11] (Emphasis added.) Accordingly, "losses" are distinctly different from the underlying "wrongful acts" for which the Directors may be liable.[12] Under the policy, there can be no "loss" until a claim is made and the legal obligation to pay is determined. Therefore, it is inaccurate to argue, as Gilliam does, that coverage is triggered under the policy "at the time the loss occurs." Here, *wrongful acts* were allegedly committed in 1983 and 1984, but no "loss" has yet occurred.

What Gilliam obviously means to argue is that the annual limits of liability are triggered when *wrongful acts* occur. Under the terms of the policy, however, the insurer is only liable for "losses," and not "wrongful acts." This being the case, it is irrelevant when the wrongful acts occurred. What matters is when a *loss* occurs, and losses by definition can only occur when a claim is made (although under the policy a claim will be deemed to have been made either at the time notice is given to the insurer or at the time the claim is actually filed, whichever comes first).

Moreover, American points out that the "coverage preservation" theory advanced by Gilliam as the proper interpretation of Section 4(B) leads to "bizarre and indefensible" results when it is applied to fact situations that differ from those presented in the *Kidwell* case. For example, if a claim is made in year two of the policy period for a wrongful act that occurred prior to the policy period, under Gilliam's theory, the making of such a claim has "preserved coverage." Although coverage has been established, however, it would be impossible to apply any yearly liability limit to such a claim, because, under Gilliam's theo-

ry, the yearly limits apply to the years in which a wrongful act occurred. Because this hypothetical wrongful act did not occur during *any* policy year, no liability limit applies even though the loss is supposedly "covered." [13]

The Court notes that rejection of Gilliam's interpretation of the policy will not always result in limiting the coverage available to an insured. In fact, adoption of Gilliam's theory would dramatically limit the coverage available to an insured if the unique facts of this case were slightly altered. Under Gilliam's theory, if wrongful acts leading to three separate losses had occurred during policy year one, but notice of these potential claims was given (or actual claims were made) in years one, two, and three, respectively, only one year of coverage would be available. Under American's interpretation of the policy, however, three yearly limits of liability would apply.

In conclusion, although the language of the MGIC policy lacks the clarity of other D & O claims-made policies that were cited to the Court, taken as a whole it is not ambiguous. The policy, though clumsily drafted, does outline a discernible coverage scheme that relates covered losses to the earlier of two events: the giving of notice of a potential claim within the policy period, or the filing of an actual claim within the policy period. Interpretation of the policy in its entirety reveals that coverage is not triggered at the time a wrongful act occurs, as Gilliam suggests. Gilliam's interpretation of the policy rests on an inaccurate application of the term "loss" that contradicts the definition of loss provided in the policy. Moreover, Gilliam's theory of how coverage is triggered under the

---

**11.** In Section 1(E) of the MGIC Policy, "wrongful acts" are defined as errors, acts or omissions, and breaches of duty.

**12.** The FDIC contends that this interpretation of the term "loss" is barred by principles of issue preclusion because it has been previously litigated in the multiple loss action. *Eureka.* The Court rejects this contention. *See* discussion at pp. 348–49.

**13.** The FDIC responds to this argument by suggesting that Section 4(B) of the policy was intended to deal with precisely this problem. Ac-

cording to the FDIC, Section 4(B) applies only to those situations in which a wrongful act occurs prior to the policy period, or to situations in which notice and a claim are made in different policy years for the same wrongful act. In these situations, according to the FDIC, the annual limit for the policy year in which notice was given or a claim was made, whichever comes first, will apply. The FDIC's analysis, however, stretches the policy language beyond the breaking point, because the policy does not state or imply that Section 4(B) is limited to the two scenarios the FDIC suggests.

policy produces anomalous results outside the context of these peculiar facts, as in the case where a wrongful act occurs before the policy period but is reported to the insurer during the policy period.

Accordingly,

IT IS HEREBY ORDERED that Gilliam's motion for summary judgment is denied, and American's cross-motion for summary judgment is granted. The Court finds that American received notice of potential claims in only the last year of a three-year policy period, and that the defendant's maximum exposure is for one yearly limit of liability, or $20 million per director, for a total amount of $100 million.